IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| LISA D. COLBERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:17-cv-555-TSE-MSN |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 10) and Memorandum in Support (Dkt. No. 11), Defendant's Motion for Summary Judgment (Dkt. No. 16) and Memorandum in Support (Dkt. No. 17), Defendant's Opposition to Plaintiff's Motion for Summary Judgment (Dkt. No. 18), and Plaintiff's Reply Memorandum in Further Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 20). Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the Social Security Administration's determination that she is not disabled within the meaning of the Social Security Act. For the reasons that follow, the undersigned recommends denying Plaintiff's Motion for Summary Judgment and granting Defendant's Motion for Summary Judgment.

**I.     Background**

**A.     Plaintiff's Alleged Disability**

On April 2, 2013, Plaintiff applied for disability insurance benefits and supplemental security income, claiming that she became disabled as of September 8, 2009 (later amended to an onset date of July 9, 2011). Tr. 53, 101–02, 121, 227–35, 313; Compl. ¶¶ 4, 6. Plaintiff's

alleged disability is due to headaches, including chronic headaches and migraines, as well as osteoarthritis of the right ankle/foot, lumbar degenerative disc disease, and obesity.  Tr. 313; Compl. ¶ 4.  Plaintiff also suffers from hypertension and hypothyroidism that are managed with medication and do not prevent her from engaging in daily activities.  Tr. 82, 257, 312. Because Plaintiff only challenges the administrative law judge's ("ALJ") findings regarding her chronic headaches and migraines, the background information is largely confined to a discussion of her treatment for these conditions.  *See* Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 2 (Dkt. No. 11).  The record includes three evaluations of Plaintiff's health and physical ability that are relevant to her appeal, each of which is discussed below.

### 1.    Dr. Larry L. Stephenson's Report

Dr. Larry L. Stephenson, MD ("Dr. Stephenson") is a board-certified neurologist who has treated Plaintiff for chronic migraines and daily headaches since November 16, 1999 (though her symptoms were first reported in 1992).[1]  Tr. 668.  Dr. Stephenson's report includes references to Plaintiff's treatment records and a comparison of her headaches and symptoms before and after July 9, 2011, the alleged onset date of her disability.  Tr. 635, 668, 767, 774, 795.  Dr. Stephenson concluded in both 2012 and 2016 that Plaintiff is disabled. Tr. 672, 795.

Prior to the onset of Plaintiff's claimed disability, Dr. Stephenson prescribed Vicodin, Neurontin, Hydrocodone, and Stadol to relieve Plaintiff's pain from headaches.  Tr. 491–92. He noted that Plaintiff has "a very long history of headaches, migrainous in nature without clearly an explanation," Tr. 668, and described them as causing "a visual field change in the left eye."  Tr. 669–70, 774.  In July 2002, Plaintiff reported having headaches almost daily.

---

[1] In a letter dated December 14, 2015, Dr. Stephenson wrote that he had been treating Plaintiff for more than 15 years, and that she had experienced headaches since the age of 23.  Tr. 774.  In other words, Plaintiff suffered from headaches for 18 years before the onset of her alleged disability.

Tr. 670.  In 2004, Plaintiff's headaches worsened, causing her to go to the emergency room at least twice that year.  Tr. 670.  As Plaintiff's headaches increased in severity, Dr. Stephenson changed her medications, noting that Plaintiff "could recall no longer than 3 weeks at most without headaches over her entire life span once headaches started."  Tr. 670.  By 2005, Plaintiff had tried 17 different medications and 10 different abortive medicines and had visited the emergency room multiple times, largely for treatment for her "more severe and acute headaches."  Tr. 671.  In 2006, she was experiencing headaches 7 out of 28 days. Tr. 669.

Plaintiff again visited the emergency room in 2010 for a "typical migraine headache" that would be temporarily relieved by Vicodin, Stadol, or Advil.  Tr. 593.  The notes of her visit state that she "came to the emergency department with her mother[,]" who was there for abdominal pain, and was given a physical exam after experiencing one of her "usual more severe migraine headaches."  Tr. 593.  The emergency department discharged her, documenting that she was in "good condition" and that her "[c]ranial nerves [were] grossly intact" and her "[s]trength and sensation grossly intact."  Tr. 593–94.  Plaintiff was advised to return if she became "acutely worse."  Tr. 594.

On March 30, 2010, Plaintiff experienced "a left parietal headache which is sharp and piercing in nature unlike most of the headaches she has had before."  Tr. 487.  As a result, Dr. Stephenson prescribed Nadolol, which is typically used to treat high blood pressure, but which Dr. Stephenson believed could also help her headaches, and decreased her dosage of Neurontin.  Tr. 487.  On September 5, 2010, Plaintiff went to the emergency room for a wound check, and during that visit, she said that she was not taking any medication.  Tr. 595. But almost two months later, on November 1, 2010, Dr. Stephenson expressed concern about

Plaintiff's frequent use of medications.  Tr. 486, 489.  At that time, Plaintiff said that she was "doing fair" but continued to experience headaches.  Tr. 486.  On November 11, 2010, at a visit with her orthopedist, Plaintiff "denie[d] getting [Hydrocodone] from anywhere else" when Dr. Stephenson was, in fact, still prescribing it for her.  Tr. 347, 485.  Plaintiff also said that she was only taking three pills a day; one day later, Dr. Stephenson refilled her prescription to take at most six pills a day.[2]  Tr. 347, 485.  Plaintiff's orthopedist reviewed a prescription monitoring report that revealed Plaintiff was receiving prescriptions from multiple providers and "on average, 300 to 400 pills per month."  Tr. 347.

In 2011, Plaintiff's treatment plan consisted of Stadol, Hydrocodone, and Orbivan to minimize her headaches.  Tr. 471–73, 545, 672.  On May 2, 2011, Plaintiff reported that her headaches were "occurring 3 times a week."  Tr. 469.  Dr. Stephenson recommended that she continue her medications as prescribed and try a neck brace to relieve some pain.  Tr. 469.  Dr. Stephenson also prescribed her Fioricet for tension headaches.  Tr. 470.  On June 3, 2011, Dr. Stephenson gave Plaintiff a refill for Hydrocodone but advised her to only take five tablets a day because she was five days early in requesting a refill.  Tr. 506.

After the alleged onset of her disability, Plaintiff continued to take Stadol, Hydrocodone, and Orbivan for her headaches and migraines, and was prescribed the same dosage.  Tr. 520–41.  At her visits on July 18, 2011 and September 13, 2011, Dr. Stephenson wrote that Plaintiff was "doing o.k."  Tr. 520, 527, 540.  His notes also show that on September 13, Plaintiff "went on [an] interview" that morning and that her vision, allegedly impacted by severe headaches, was "good."  Tr. 527.  On October 13, 2011, Dr. Stephenson

---

[2] Dr. Stephenson prescribed her to "take 1 tablet by mouth 6 times daily for 3 days, then take 1 tablet by mouth 5 times daily for 3 days, then take 1 tablet by mouth 4 times a day for 3 days, then take [1] tablet by mouth 3 times a day and continue on that dose . . . ."  Tr. 485.  His future prescriptions for Hydrocodone directed Plaintiff to take five pills daily.  Tr. 471, 474–76, 479–81, 648–49, 652, 654–56, 658, 661, 663–64, 667, 672, 718–19, 723–24, 727, 733–34, 737, 742–43, 745–46, 749–50, 752, 757–58, 761, 776–77, 780–81, 784–85, 791, 793–94.

noted that Plaintiff's "meds [are] doing well."  Tr. 524.  Her next appointment was not until November 10, 2011, almost one month after her previous one.  Tr. 520.  During that visit, Plaintiff said that she had to use Stadol in the morning because her headaches were "so bad," and Dr. Stephenson noted that she was "using a lot of Stadol," but that she was also "doing o.k."  Tr. 520.

On July 23, 2012, Plaintiff told the physician's assistant for her orthopedist that she was not taking any pain medication at the time because of the expense, not knowing about the Fauquier Free Clinic.  Tr. 562.  Shortly thereafter, Plaintiff began filling most of her prescriptions at the clinic, often refilling them every two weeks.  Tr. 672.  In a letter dated December 21, 2012, Dr. Stephenson noted that although medication had improved Plaintiff's pain at times, he had found "no good preventative agent [to allow] her to live a normal life without missing multiple days of work."  Tr. 668.  He stated that she was having headaches every day, but she otherwise had normal neurological results.  Tr. 669.  That year, he concluded that she was disabled.  Tr. 672.

On September 10, 2013, Dr. Stephenson completed a Headaches Impairment Questionnaire, in which he reported seeing Plaintiff monthly for daily headaches and chronic migraines occurring three times a week—both ranging from moderately intense to severely intense.  Tr. 635–36.  The headaches were triggered by bright lights, food, noise, strong odors, lack of sleep, menstruation, stress, hunger, weather changes, and hypoglycemia.  In addition, the record reflects that bright lights, stress, noise, coughing/straining/bowel movement, and her foot pain could exacerbate the headaches.  Tr. 636–37.  Dr. Stephenson further noted that Plaintiff experienced nausea/vomiting, malaise, photosensitivity, mood changes, and visual disturbances as a result of her headaches, though none of these symptoms were documented in

any of the medical records.  Tr. 636.  Notably, in response to a question about limitations affecting Plaintiff's ability to work, Dr. Stephenson did not mark "limited vision" as an applicable limitation.[3]  Tr. 639.

According to the questionnaire, Dr. Stephenson instructed Plaintiff to rest, turn off the lights, and avoid noise, offending agents, and stress when she experiences a headache. Tr. 637.  Although he stated that her stress, anxiety, and depression prompted headaches and would "lead to missing work on a basis that would be grounds for termination of employment[,]" he noted that she responded reasonably well to Hydrocodone and Stadol for severe headaches, and that she is capable of low stress work.  Tr. 638–39.

On the other hand, he also wrote that her relief is temporary, and that the pain returns after a few hours, concluding that Plaintiff would be precluded from performing even basic work activities when suffering from a headache.  Tr. 638–39.  He estimated that she would likely be absent either two to three times a month or more than three times a month.  Tr. 639. Notwithstanding that Plaintiff's symptoms began in 1992 and that she worked until 2009 despite those same symptoms, Tr. 65, 243, 308, 639, Dr. Stephenson indicated that Plaintiff's work environment must be restricted for psychological limitations and to avoid wetness, noise, fumes, gases, temperature extremes, humidity, dust, and heights, and that the job must not require her to push, pull, kneel, bend, or stoop.  Tr. 639.

On June 18, 2013, Plaintiff received a prescription for Stadol from the clinic, but stated that she "only uses it very occ[asionally] like when she has a migraine when she wakes up in the a.m."  Tr. 685.  On November 14, 2013, Plaintiff returned to the office for a

---

[3] Two years earlier, he had recorded that her vision was "good," and in December 2013, he noted that her "[v]isual fields are intact," and that her "vision does not seem to be significantly impaired" despite "some slight blurring in the optic nerve . . . [and] spontaneous venous pulsations."  Tr. 527, 666.  It was not until December 2015 when Plaintiff complained of blurred vision.  Tr. 792.

prescription refill and said she had "no problems." Tr. 667.  On December 17, 2013, Dr. Stephenson found Plaintiff to be "fairly well compensated despite the fact that she does require occasional Stadol Nasal Spray and the Hydrocodone." Tr. 666.  Plaintiff continued to see Dr. Stephenson periodically into 2014, and consistently noted doing well and improvements in pain management. *See, e.g.*, 655–56, 661, 664.  Her response to treatment seemed to improve even though her medications and dosage had not changed, and the headaches were about the same. Tr. 654; *see also* 648–49, 652, 677, 679.

Throughout 2015 and 2016, Plaintiff reported that she was "doing good [sic]," Tr. 718, 733, 745, 757, 761, 776, 793, "doing o.k.," Tr. 725, 742, 749, 754, 780, that her "meds [were] working good [sic]," Tr. 749, her "meds were working well," Tr. 793, that her headaches were "about [the] same," Tr. 727, and that there were "no new problems," Tr. 785.  At her visit in March 2015, she said she had "at least 6 or 7 headaches a month of a severe nature and also some lower grade headaches." Tr. 753.  But she stated that she was "stable," and Dr. Stephenson did not change her medications. Tr. 753.  On September 22, 2015, she said the headaches were "still intense," but they did not increase in intensity, and Dr. Stephenson did not change her treatment plan. Tr. 724.  On separate occasions, Dr. Stephenson noted that she looked "happy," Tr. 745, 761, 780, her "pain [was] better," Tr. 745, and she "seemed to be doing good [sic] smiling," Tr. 757.  On June 23, 2015, Dr. Stephenson wrote that Plaintiff "does not have HA [headaches] every day." Tr. 738.  Around this time, Dr. Stephenson also prescribed Plaintiff Tramadol and Fiorinal for tension headaches. Tr. 720, 722, 724–26, 735, 739–40, 744, 751, 778, 782–83, 788, 792.  In a July 2015 letter to Dr. Stephenson, Plaintiff said that she had not been to the clinic "for a few months" and had run out of Orbivan. Tr. 731.  One month later, Dr. Stephenson documented her early request for a refill of

Hydrocodone.  Tr. 727.

In  December  2015,  Dr.  Stephenson  completed  a  second  Headaches  Impairment Questionnaire.  Tr. 767–72.  In it, he stated that since her termination from the bank, Plaintiff had been "wracked with pain" from her head and right foot, while also stating that Plaintiff "has had [the] same presentation of HA [headaches] since 2000."  Tr. 767.  At the time of the questionnaire, Plaintiff refilled her prescriptions every month and scheduled office visits every one to three months.  Tr. 767.  Like in September 2013, Dr. Stephenson classified her headaches as moderately intense to severely intense, but he found that she had additional symptoms—vertigo, mental confusion/inability to concentrate and sensitivity to noises—and moving around now exacerbated her headaches.  *Compare* Tr. 636–37 *with* Tr. 768–69.  On the other hand, coughing and straining/bowel movement no longer affected her headaches, and Dr. Stephenson no longer advised her to turn off lights and avoid noise, offending agents, and  stress.   *Compare* Tr. 637 *with* Tr. 769.   Instead, he  recommended  that  she  take medication, hydrate, and rest.  Tr. 769.  The medication, he believed, "reduce[d] and often stop[ped] headaches."  Tr. 770.  In fact, in December 2015, he found that he was able to completely  relieve  the  pain  with  medication  without  unacceptable  side  effects  "in  most cases," and that Plaintiff was now capable of moderate stress at work.  *Compare* Tr. 638–39 *with* Tr. 770–71.  He also noted that she has limited vision, but only at night.  Tr. 771.

Despite expressing success in treating her, Dr. Stephenson opined that she would still miss more than three days a month of work, but that she no longer needed to avoid wetness and humidity.  Tr. 771.  But in a letter dated August 19, 2016,[4] Dr. Stephenson recommended her avoiding wetness and humidity, and stated that she could only endure "low amounts of

---

[4] This exhibit—18F—is dated after the April 15, 2016 hearing before the ALJ.  Tr. 52–53.  The letter is included in the administrative record.  Tr. 795.

work stress." Tr. 795.  He also mentioned that her pain and fatigue could "interfere with her attention and concentration." Tr. 795.

In an earlier letter from December 2015, Dr. Stephenson had similarly stated that Plaintiff has "at times a problem with multitasking and with concentration," but he did not associate that with Plaintiff's headaches. Tr. 774–75.  That assertion followed his discussion of Plaintiff's right ankle and the seven ankle operations she endured. Tr. 774–75.  The same day of his letter, Dr. Stephenson saw Plaintiff for an office visit, noting that she has three types of headaches, one of which is "very hard to treat and goes on for days at a time." Tr. 792.  Dr. Stephenson did not alter Plaintiff's treatment. Tr. 792.  On March 8, 2016, Plaintiff's most recent visit with Dr. Stephenson in the record, Dr. Stephenson said that while Plaintiff's headaches were "worse in [the] a.m.," they "get[] better as [the] day goes on." Tr. 776.  Plaintiff also said that she was "doing good [sic]." Tr. 776.

### 2.  Dr. William Amos' Report

The second opinion regarding Plaintiff's health and physical ability was rendered by state agency physician Dr. William Amos, MD ("Dr. Amos"), on November 12, 2013, in the course of evaluating Plaintiff's initial application for disability insurance benefits. Tr. 77–100.  From the record, it appears that Dr. Amos never met with or examined Plaintiff but rather based his assessment of her residual functional capacity ("RFC") on Dr. Stephenson's report and other record evidence related to Plaintiff's application. Tr. 82–84.  Dr. Amos found that one or more of her medical impairments could reasonably produce her pain, but he concluded that her statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence. Tr. 83, 95.  He opined that her statements were only partially credible because even though she is suffering

from various physical impairments, they were not "limiting enough to prevent her from performing work." Tr. 84, 96.  Given her daily activities—which consist of preparing meals, doing minor household chores, driving short distances, grocery shopping, attending church, and going to the park—and the medical evidence, he determined that her claims regarding the severity of her ailments and her limitations were "somewhat exaggerated" and "not fully supported" by her medical records.  Tr. 84, 94, 96.  She had sought treatment to alleviate her pain, and he noted that the treatment had been "fairly successful in relieving symptoms." Tr. 84.  Because her headaches could be managed with medication and did not "significantly interfere with [her] ability to carry out [her] ordinary daily activities[,]" Dr. Amos concluded that Plaintiff is not disabled or limited to unskilled work, though it must be light in nature. Tr. 86–87, 99–100.

In reaching this conclusion, Dr. Amos accounted for Plaintiff's ability to lift only 20 pounds occasionally and 10 pounds frequently and her capacity to stand about six hours in an eight-hour workday and sit for that same period of time.  Tr. 84, 87, 95–96.  He found that she could occasionally climb ramps, stairs, ladders, ropes, and scaffolds and occasionally balance, stoop, kneel, crouch, and crawl.  Tr. 85, 97.  In his opinion, she did not have any visual limitations, but because of her headaches, she needed to avoid concentrated exposure to noise. Tr. 85–86, 97.  Contrary to Dr. Stephenson, Dr. Amos did not deem Plaintiff sensitive to extreme temperatures, wetness, fumes, odors, dust, and gases.  *Compare* Tr. 85, 97–98 *with* Tr. 636–37, 639, 795.  In light of her RFC, age, and twelfth-grade education, and the medical-vocational guidelines, Dr. Amos found that she could perform other work, though he did not have sufficient information as to whether she would be able to resume her past relevant work. Tr. 86–88, 98–99.

### 3.      Dr. Navjeet Singh's Report

State agency physician Dr. Navjeet Singh, MD ("Dr. Singh") performed the third evaluation of Plaintiff's health and physical limitations on May 6, 2014 after Plaintiff's initial application for disability benefits was denied. Tr. 103–15. He analyzed the medical evidence and Plaintiff's claim for reconsideration of her disability determination. Tr. 109–15. He had no treatment relationship with Plaintiff, and based on the record, it does not appear that he saw her before completing the RFC assessment. Tr. 109–15. Dr. Singh agreed with Dr. Amos' evaluation, noting that Plaintiff's condition had not worsened since the initial denial of her claim, and that there was no change in her functional limitations. Tr. 109, 113. Like Dr. Amos, Dr. Singh relied upon Plaintiff's daily activities to justify his conclusion that she is not disabled. Tr. 110, 113–14. In fact, his explanation for finding her statements partially credible is identical to Dr. Amos' as well as his reasoning for denying her claim. *Compare* Tr. 84, 87–88, 96, 100 *with* Tr. 111, 115. The sole distinction in his RFC assessment is that he concluded Plaintiff can balance frequently—not just occasionally. *Compare* Tr. 85, 97 *with* Tr. 112. He also determined that she could engage in past relevant work as a customer service representative, which is light in nature. Tr. 113–14.

### B.      Administrative Proceedings

After the Social Security Administration denied Plaintiff's application for disability insurance benefits—initially on November 12, 2013, and again upon reconsideration on May 6, 2014—Plaintiff requested a hearing before an ALJ. Tr. 142. The hearing occurred on April 15, 2016. Tr. 49, 51, 178.

At the hearing, Plaintiff's counsel asked to move the alleged onset date from September 8, 2009 to July 9, 2011 because she continued to experience headaches that

"seemed to worsen over time . . . [and] were noted to be three times weekly as of May 2nd." Tr. 54.  She described them as beginning on the left side of her neck and traveling to her eye, affecting her eyesight, and preventing her from clearly hearing what people are saying. Tr. 55–56.  When she does experience the headaches, they can last anywhere from one hour to four hours.  Tr. 56.  She stated that when suffering from one, she goes into a dark room without noise, sleeps if possible, and takes medication.  Tr. 56.  Her headaches are also impacted by rain, snow, NutraSweet, citrus fruit, and her menstrual cycle.  Tr. 57.

Plaintiff did not testify about her longstanding relationship with Dr. Stephenson and her frequent visits to his office beginning 12 years before the onset of her alleged disability. Her description of her symptoms was brief and largely inconsistent with Dr. Stephenson's evaluation, which did not corroborate Plaintiff's description of the severe impact on her vision and hearing and which described her headaches lasting as long as several days—not one to four hours.  *Compare* Tr. 55–57 *with* Tr. 636–40, 768–72, 795.  Dr. Stephenson's report focused on the degree of stress she would experience at work, her environmental limitations, and her lack of attention and concentration when she experiences a headache—none of which Plaintiff mentioned.  *Compare* Tr. 55–57 *with* Tr. 636–40, 768–72, 775, 795.  The only points in common between Plaintiff's and Dr. Stephenson's statements are that both noted the frequency of her headaches, how she responds to them—although Dr. Stephenson's comments on this vary over time—and that Plaintiff's medication alleviates some of the pain from her headaches.  *Compare* Tr. 55–56 *with* Tr. 635–38, 768–70.

Plaintiff also testified about her daily activities, which include letting her dogs out, feeding them, washing and folding clothes, making sandwiches, washing dishes depending on how many, dusting, taking baths, accompanying her sister to the park, attending church on

Sunday if she does not have a headache, grocery shopping if she needs minimal items, watching television, and listening to music.  Tr. 57–60, 66.  Plaintiff stated that she spends four days of the week sleeping during the day for two to three hours.  Tr. 58.  At night, she gets about four to five hours of sleep.  Tr. 58.

When the ALJ asked her about her most recent job, she explained that her inability to perform that position was due to her incapacity to sit or stand for long periods of time—not her headaches.  Tr. 65.  She also said that she was terminated because of her part-time status at the bank, not because of any medical impairment.  Tr. 65.  In addition, she admitted to looking for other employment in either 2010 or 2011—one to two years after she was terminated.  Tr. 65.  She said that she did not pursue one receptionist position because it would require her to clean rooms, and she declined to pursue other receptionist jobs because "the lighting [at an office could] give [her] a migraine."  Tr. 66.

The ALJ also posed hypothetical questions to an impartial vocational expert ("VE"). Setting forth physical limitations consistent with Plaintiff's testimony and Dr. Stephenson's evaluation, the ALJ elicited testimony from the VE regarding a person constrained by such limitations as "light work with occasional balancing, stooping, kneeling, crouching, crawling and climbing, occasional exposure to vibrations, occasional exposure to pulmonary irritants including fumes, odors, dust and gas, occasional exposure to hazardous conditions including unprotected heights and moving machinery, moderate noise exposure which is defined as business office with typewriters in use, department store, grocery store, light traffic and fast food restaurants at off hours."  Tr. 70.  The VE stated that Plaintiff's past work as a bank teller and customer service representative would still be performable given the above limitations.  Tr. 71.  The VE stated, however, that if the person in question were only able to

perform simple routine tasks, he or she would not be able to maintain employment as a bank teller or customer service representative but could be a cashier, mail clerk, or office helper. Tr. 71–72.  If that hypothetical person required a sit-stand option every 30 minutes, the cashier (approximately 284,000 positions in the United States) and office helper (approximately 58,000 positions in the United States) positions would remain viable, and a shipping/receiving weigher (approximately 19,000 positions in the United States) would be another option.  Tr. 72–73.  If the type of work changed from light to sedentary, the expert said such a person could be an order clerk (approximately 19,000 positions in the United States), charge account clerk (approximately 16,000 positions), and document preparer (approximately 98,000 positions).  Tr. 73–74.  If the sit-stand option were added to the hypothetical, the positions and their availability in the United States would not change. Tr. 74.

In response to the ALJ's question about absences, the VE stated that if a person had "two unplanned absences a month on a routine basis," that would "eliminate all competitive employment."  Tr. 73.  Similarly, if the person "due to impairments and limitations" were to "be off task 20 percent of the time," there would be no available jobs in the marketplace. Tr. 73.  Plaintiff's counsel did not have any questions for the VE.  Tr. 73.

On May 11, 2016, the ALJ issued an opinion holding that Plaintiff is not disabled within the meaning of the Social Security Act.  *See* Tr. 25–42.  The ALJ found that Plaintiff's migraine headaches constitute a severe impairment, Tr. 25–26, but did not constitute a medical impairment under subsection 11.03 of 20 C.F.R. Part 404, subpart P, Appendix 1. Tr. 27.  The ALJ found that the record evidence did not support headaches occurring more frequently than once weekly or resulting in alteration of awareness, loss of consciousness, or

significant interference with activity during the day.  Tr. 27.  Specifically, the ALJ noted that Plaintiff had denied having vision problems and stated that her medications relieved some of the pain from her headaches.  Tr. 27.  The ALJ then concluded that Plaintiff retains the residual functional capacity to perform at least light work, "even with . . . non-exertional limitations,"[5] such as the jobs noted by the VE at the April 15, 2016 hearing.  Tr. 28, 40–42; *see* 20 C.F.R. § 404.1567 (defining "light work").

In reaching this conclusion, the ALJ first found Plaintiff's credibility lacking because Plaintiff's "treatment record does not support her allegations regarding the severity of her limitations."  Tr. 35.  For instance, as noted above, Plaintiff said on several occasions from 2011 to 2016 that she was either doing okay, well, very well, her pain had improved, or she had no problems.  Tr. 35–36; *see supra*, at 4–5, 7.  Plaintiff also misstated whether anyone else was providing her with Hydrocodone, casting further doubt on her credibility.  Tr. 36, 347, 485.  As a result, the ALJ based her reasoning largely on Plaintiff's medical records, which reveal that Plaintiff's medications were successful.  Tr. 36.  At times, Plaintiff did not fully comply with her treatment plan, occasionally failing to refill her prescriptions, which the ALJ found surprising for someone "truly suffering to the extent alleged," especially given Plaintiff's access to and use of the Fauquier Free Clinic.  Tr. 36–37.  Moreover, the ALJ concluded that because there "has been no ongoing treatment by a pain management" specialist and her records do not show any "significant neurological deficits or decreased strength or range of motion, as would be expected with the degree of limitations alleged," her testimony cannot be given full effect.  Tr. 37.

---

[5] These limitations include (1) a sit/stand option every 30 minutes if needed; (2) occasional balancing, stooping, kneeling, crouching, crawling, and climbing; (3) occasional exposure to vibrations, pulmonary irritants—including fumes, odors, dust, and gas—and hazardous conditions like unprotected heights and moving machinery; and (4) moderate noise exposure.  Tr. 28.

Having found Plaintiff's testimony lacking in credibility, the ALJ next discussed the medical evaluations of Drs. Stephenson, Amos, and Singh.  The ALJ gave partial weight to Dr. Stephenson's assessment of Plaintiff's headache causes and their interference with her concentration.  Tr. 39.  On the other hand, some of his opinions were afforded little to no weight because his report was not wholly consistent with the record evidence, including his treatment notes, despite Dr. Stephenson's long treatment relationship with Plaintiff.  Tr. 39.  For example, although he estimated that Plaintiff would miss three days per month of work, Plaintiff's medical records suggest otherwise—that she is doing "o.k." and that her medication is working.  Tr. 39.  Consequently, the ALJ concluded that Dr. Stephenson "relied quite heavily on the reported symptoms and limitations provided by the claimant and seemed to uncritically accept as true most, if not all, of what the claimant reported."  Tr. 39.

The ALJ accorded partial weight to the agency physicians' reports because their assessments were "consistent with the overall evidence of record."  Tr. 40.  The ALJ noted that both Drs. Amos and Singh are "experts in all phases of disability evaluation and are well qualified to render an opinion regarding the nature and severity of the claimant's impairments," despite never having seen or treated Plaintiff.  Tr. 39–40.  Even though the ALJ stated that she only accorded partial weight to their opinions, she adopted their findings—not Dr. Stephenson's.  Tr. 39–40.  The ALJ decided that although Plaintiff could not perform her past positions as a bank teller or customer service representative, she could meet the obligations of a cashier II, office helper, or shipping/receiving weigher.  Tr. 40–41.  In arriving at this decision, the ALJ discounted any unplanned absences from work that Plaintiff could have due to headaches, finding potential absences unsupported by the medical evidence.  Tr. 41.

After the ALJ issued her decision, Plaintiff sought review by the Appeals Council, which declined to take the case.  Tr. 1–3.  This appeal followed pursuant to 42 U.S.C. § 405(g).

## II.    Legal Standard

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays*, 907 F.2d at 1456. "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## III.     Analysis

Determining whether an applicant is eligible for disability insurance benefits under the Social Security Act entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in Appendix I of 20 C.F.R. Part 404, subpart P; (4) the claimant can perform her past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). The ALJ assigned partial weight to Drs. Amos and Singh's reports, partial weight to Dr. Stephenson's opinion about Plaintiff's headache triggers and symptoms, little to no weight to the significant physical limitations found by Dr. Stephenson, and little to no weight to Plaintiff's testimony.  Tr. 35–40.  The ALJ then concluded that Plaintiff retains the residual functional capacity to perform certain kinds of "light work" such as serving as a cashier II, office helper, or shipping/receiving weigher.  Tr. 41.

### A.     Weight Afforded to Medical Opinion Evidence

Plaintiff first argues that in weighing the relative merits of the medical reports, the ALJ improperly disregarded the "treating physician rule" and gave undue deference to the non-examining consultants.  Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 11–17. Plaintiff asserts that had the ALJ applied the treating physician rule and accorded Dr. Stephenson controlling weight, the ALJ would have found Plaintiff to be disabled in light of the extensive limitations set forth in Dr. Stephenson's report.  *Id.* at 12–13.  Plaintiff takes issue with the ALJ's emphasis on physical findings, arguing that headaches "cannot be documented by any alarming clinical or objective testing or treated by more aggressive means

than medications." *Id.* at 11.  Nevertheless, Plaintiff claims that Dr. Stephenson's treatment notes document "persistent, chronic, daily headaches even when Ms. Colbert was 'okay' or stable with medication." *Id.* at 13.

Pursuant to the Social Security Administration's regulations, a treating physician's medical opinion regarding the nature and severity of an impairment is given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Consequently, an ALJ "may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence."  *Hines*, 453 F.3d at 563 n.2 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam) (internal quotation marks omitted)); *see Burchett v. Colvin*, No. 1:15-cv-0411-JFA, 2015 WL 5970042, at *17 (E.D. Va. Oct. 13, 2015) (finding that treating physician rule is "far from absolute").  Even when a treating physician's medical opinion is accorded something less than "controlling weight," the ALJ is "obligated to evaluate and weigh medical opinions 'pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.'"  *Hines*, 453 F.3d at 563 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005)); *see also* 20 C.F.R. § 404.1527(c).

The ALJ's opinion does not  explicitly reference the "obligat[ory]" analysis but appears to have considered all of the above mandatory factors.  *See Hines*, 453 F.3d at 563. The ALJ acknowledged that Dr. Stephenson treats Plaintiff and has a "relatively longitudinal

treating relationship" with her, but found that Dr. Stephenson's opinion was based on "limited physical findings and generally routine and conservative treatment." Tr. 39. The ALJ noted that Dr. Stephenson's assessment of Plaintiff's potential absences from work and her inability to work, for example, are not consistent with the record, which includes treatment notes stating that Plaintiff is managing her symptoms, and that her medication is working. Tr. 39. Finally, the ALJ credited Dr. Stephenson as having "expertise as a neurologist." After evaluating each of the steps, the ALJ concluded that Dr. Stephenson's report should be accorded partial weight because it is not consistent with record evidence, and there is other "persuasive contrary evidence." *See Hines*, 453 F.3d at 563 n.2.

As discussed below, Dr. Stephenson's 2012 conclusion that Plaintiff is disabled, Tr. 672, is unsupported by the record. Specifically, Plaintiff's own statements, actions, and capabilities, as evidenced in the record, contradict the extent of the physical limitations described by Dr. Stephenson. There is no explanation by Plaintiff or Dr. Stephenson as to why Plaintiff's headaches, which have existed since 1992, became so severe after July 9, 2011 as to constitute disability and prevent her from maintaining employment. *See Craig v. Carter*, 76 F.3d 585, 596 n.7 (4th Cir. 1996) (concluding that plaintiff could not be found "disabled without a claim of significant deterioration of her condition . . . from the time when she was admittedly able to work").

The medical record does not support Plaintiff's claim that her symptoms significantly worsened from July 9, 2011, onward. *See, e.g.*, Tr. 668, 670–71 (noting that Plaintiff has suffered from her headache symptoms since 1992; that her headaches "have been consistent" since her adolescence; that the headaches fluctuated in severity before the onset of her alleged disability, causing her to visit the hospital "numerous times" between 2004 and 2006; and that

20

Plaintiff "had missed work more in 2006 than any other previous years" due to headaches); Tr. 767 (noting similarities between Plaintiff's headaches prior to the onset of her alleged disability and those experienced afterward).

After the alleged onset of her disability, Dr. Stephenson continued to prescribe the same medications—Stadol, Hydrocodone, and Orbivan—at the same dosages, to treat the headaches and migraines. Tr. 520–41. Notably, Plaintiff's headaches were sufficiently managed by pain medication such that she was able to be continuously employed in various positions from 1990 until 2009, Tr. 243, despite suffering from the same type and severity of symptoms since the onset of headaches in 1992 and despite Dr. Stephenson's prediction that she would miss work more than three times per month. Tr. 770–71.

The fact that Plaintiff reported frequent headaches is not dispositive of whether she has a disability preventing employment, specifically given that she also self-reported "doing o.k.," Tr. 520, 524, 527, 540, 656, 725, 742, 749, 754, 780, "feeling o.k. despite not having her meds," Tr. 677, "doing good [sic]," Tr. 648, 652, 655, 718, 733, 745, 757, 761, 776, 793, "doing well," Tr. 524, 679, or "very good [sic]," Tr. 649, that her "meds [were] working good [sic]," Tr. 749, her "meds were working well," Tr. 793, or "her headaches were "about [the] same," Tr. 727, and "no new problems," Tr. 785; *see supra*, at 4, 5–7. Similarly, Plaintiff's refilling of her prescriptions is not dispositive of whether she has a disability—only that her medication seems to be alleviating some pain. In fact, on several occasions, Dr. Stephenson noted that she "looked happy," Tr. 745, or "looks happy," Tr. 780, her "pain [was] better," Tr. 745, her "pain level [was] not bad," Tr. 652, she "seems to feel good [sic]," Tr. 652, "seemed to be doing good [sic] smiling," Tr. 757, and "seems happy," Tr. 649, 655, 761. These statements in the record, which span from 2011 to 2016, support the ALJ's finding of

"more than a mere scintilla of evidence" that Plaintiff "was doing okay, and that her medications were working." Tr. 35–36, 39.

Plaintiff cites three federal appellate court cases from other circuits to support her proposition that statements describing Plaintiff's wellbeing (i.e. okay, well, very well, and smiling and looking happy at doctor's appointments) are not indicative of whether she has a disability and her ability to work. *See* Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 13. Yet, even if such statements are discounted, Plaintiff's continuous employment from 1990 until 2009, despite severe headache symptoms, belies her disability claim, especially since those symptoms appear similar in severity after the alleged onset date of July 9, 2011. *See, e.g.*, Tr. 669–71 (describing Dr. Stephenson's care from 1999 to 2012 and noting daily headaches,[6] trips to the emergency room, and similar treatment plans before and after 2011). Even as Plaintiff's symptoms exacerbated and her hospital visits increased, Plaintiff continued to maintain her customer representative position until 2009. Tr. 65, 243, 308, 775.

Dr. Stephenson's statements regarding the reason for Plaintiff's job termination are also inconsistent. In treatment notes following a visit on March 30, 2010, Dr. Stephenson noted that Plaintiff "had been put on part-time work because of the multiple foot operations" and consequently, "the bank did not feel obligated to keep her." Tr. 487. This is consistent with Plaintiff's own testimony, noting that she was let go from her job because she returned to work part-time after her surgery, and the bank needed someone full-time in that position. Tr. 65. In a letter written two and a half years later, Dr. Stephenson revised the reason for termination, now attributing it to "pain issues revolving around headaches and the ankle tendon tear." Tr. 671. Three years later, on December 14, 2015, Dr. Stephenson again

---

[6] In 2016, Plaintiff testified that the frequency of her headaches was, on average, three times per week. Tr. 56. This suggests that the frequency of her symptoms actually improved over time, rather than deteriorated.

revised the reason for termination, noting that Plaintiff was "fired after making a series of mistakes and absences because of ankle reconstructive surgery." Tr. 775. Nothing in the record supports a finding that Plaintiff's headaches resulted in her termination.

Finally, Plaintiff contends that the ALJ afforded more weight to Drs. Amos and Singh's opinions than was due. *See* Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 15. The Fourth Circuit's jurisprudence "contemplate[s] the possibility" that a treating physician's medical opinion "may be rejected in particular cases in deference to conflicting opinions of non-treating physicians." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986). It is true, as noted above, that the ALJ often "give[s] more weight to medical opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations[,]" but that "treating source's medical opinion on the issue(s) of the nature and severity of [Plaintiff's] impairment(s)" must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not [be] inconsistent with the other substantial evidence in [Plaintiff's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Here, Dr. Stephenson's medical opinion regarding Plaintiff's limitations is inconsistent with the other substantial evidence in the record, therefore permitting the ALJ to give authority to the non-treating sources' opinions, which are based on that same evidence in the record.

The case law Plaintiff cites in support of minimizing the weight of Drs. Amos and Singh's reports is inapposite. If the medical records supported Dr. Stephenson's conclusions,

and the ALJ still found no disability, the case law would be relevant; but, a case that holds that non-examining physicians' opinions are "not enough to constitute substantial evidence" is meaningless when "substantial evidence" in the record supports these non-examining physicians' opinions. *See Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013); Tr. 57–60, 66 (describing Plaintiff's daily activities); *see also* Tr. 54, 56, 243, 308, 593, 670–71, 669, 775 (comparing Plaintiff's symptoms before onset date with current symptoms and noting her employment until 2009 despite her headaches worsening in 2004).

In according partial weight to both these non-treating physicians, the ALJ did not accept their reports wholesale but rather included additional limitations that Drs. Amos and Singh had not.  Tr. 28, 40.  These limitations consisted of a sit/stand option every 30 minutes, occasional exposure to hazardous conditions including unprotected heights and moving machinery, and occasional exposure to vibrations and pulmonary irritants including fumes, odors, dust, and gas—which Drs. Amos and Singh did not deem necessary in their reports. Tr. 28, 85, 97–98, 113.

Accordingly, the undersigned finds that the ALJ properly credited Dr. Stephenson's credentials and expertise as a neurologist and appropriately considered inconsistencies between his statements and the remainder of the record.

### B.      Plaintiff's Credibility

Plaintiff's second argument is that the ALJ failed to properly evaluate her testimony regarding the intensity and persistence of her pain or the effect her symptoms have on her ability to work.  Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 18–19.   This Court does not "make credibility determinations, or substitute our judgment for that of the Secretary." *Craig*, 76 F.3d at 589. Instead, the Court reviews the ALJ's credibility assessment for

substantial evidence. *See Johnson*, 434 F.3d at 658.

In evaluating a claimant's credibility, the ALJ must first determine whether there is a medically determinable impairment that could "reasonably be expected to produce the pain or other symptoms alleged" and next the "intensity, persistence, and limiting effects" of that individual's symptoms.  *See* 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).  During the second step, the ALJ must consider objective medical evidence and any other information that a claimant provides about his or her symptoms, including (1) daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, that is received for relief of pain or other symptoms; (6) any measures employed to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ must weigh a claimant's "statements about the intensity, persistence, and limiting effects" of her symptoms against the objective medical evidence and other evidence to determine disability.  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  The ALJ may only accept a claimant's symptoms as described if they are "consistent with the objective medical evidence and other evidence," but cannot reject her statements about the intensity and persistence of her pain or the effect of her symptoms on her ability to work "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her "statements concerning

the intensity, persistence and limiting effects of these symptoms [were] not entirely persuasive given the medical evidence and other evidence in the record." Tr. 34–35. The ALJ referenced particular office visits where Plaintiff self-reported as having "no problems," "doing okay," "not bad," or well and having success with her medications. Tr. 35–36. In addition, the ALJ noted inconsistencies between Plaintiff's statements and the evidence in the record. For example, Plaintiff told one physician that she was not obtaining Hydrocodone from anyone else when she was, in fact, receiving a prescription from Dr. Stephenson. Tr. 36. The ALJ concluded that the consistent use of medication is "routine, conservative, and unremarkable." Tr. 37. The fact that (1) there are gaps in her treatment, during which she did not take medication for one month despite having access to a free clinic, Tr. 677; (2) that there is "no ongoing treatment by a pain management . . . specialist," Tr. 37; and (3) that she had no "significant neurological deficits or decreased strength or range of motion, as would be expected with the degree of limitation alleged," all contributed to the ALJ's finding that Plaintiff does not have the functional limitations described. Tr. 37.

Plaintiff also argues that there is insufficient evidence to show that she "had significant or sustained improvement despite attempts to treat her [headaches] with a plethora of medications." Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 19. This argument misstates the standard by which Plaintiff's claim must be evaluated. *See Craig*, 76 F.3d at 596 n.7 (concluding that plaintiff could not be found "disabled without a claim of significant *deterioration* of her condition . . . from the time when she was admittedly able to work") (emphasis added). The fact that her headaches have not improved does not establish a deterioration of her condition beginning on July 9, 2011, especially since Plaintiff continued to be employed (from 1990 until 2009, Tr. 243) contemporaneously with her severe headache

symptoms (1992 to present).

As mentioned above, even discounting Plaintiff's self-reported descriptions of her wellbeing and the success of medications, including Plaintiff's statement that her pain was better in 2014 and 2015, Plaintiff fails to address how her alleged symptoms between 2011 and 2016 are different from those prior to her onset date.  The ALJ found that Plaintiff's statements were not consistent with any other evidence, and that the objective medical evidence not only failed to substantiate Plaintiff's statements, it often contradicted them. Tr. 35–37; *see Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595) ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.").  Unlike in *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006), where the Fourth Circuit determined that the record did not reveal any inconsistency between the plaintiff's statements and his daily activities, there is an abundance of examples in the record explained above—some of which the ALJ noted—that demonstrate inconsistencies between what Plaintiff reported during office visits, what Dr. Stephenson noted about Plaintiff's symptoms throughout their treatment relationship, and what she now argues.  Accordingly, the undersigned finds that the ALJ's credibility assessment was supported by substantial evidence in the record.

## IV.     Recommendation

In sum, the undersigned recommends:

DENYING Plaintiff's Motion for Summary Judgment (Dkt. No. 10).  The undersigned further recommends

GRANTING Defendant's Motion for Summary Judgment (Dkt. No. 16).

## V.     Notice

The parties are notified as follows.  Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to file timely objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.


                                                             /s/
                                            _____
                                                   Michael S. Nachmanoff
                                               United States Magistrate Judge

November 21, 2017
Alexandria, Virginia